Next case on the docket this morning, Cavalry SPV against Call. Counsel for the appellant, you may proceed. Please state your name for the record. Good morning, Your Honors. Counsel, may it please the Court. My name is Matt Stromquist. I'm the appointed appellant in this case, Cavalry SPV I, LLC. This case presents the Court with the question of whether to affirm the Circuit Court's rejection of controlling precedent in this district, authority that's been accepted in districts across the state as well, that allows assignees of accounts to qualify as business records the records they receive from the assignors of those accounts. In other words, the entity that sells them the account. In 2013, this Court decided the case of Bank of America v. Land, cited throughout the briefs, which affirmed this very right, and Land has been cited widely and approvingly by courts across the state, including as recently as a First District opinion on December 30th. Is that a mortgage foreclosure? It's a mortgage foreclosure case. Do you cite any appellate court cases on that issue for credit card business records? Not from the Illinois Court of Appeals. We have a Northern District of Illinois federal case adopting the same business records rule under Rule 8036 of the federal rules, which is identical in substance, if not applied to the Illinois rule, Supreme Court Rule 236, and Rule of Evidence 8036. The Land Court did—it was a mortgage foreclosure case. And the rule adopted there and as explained in numerous other cases is this. Where a business takes custody of another business's records, integrates those records into its own, and relies upon those records for the conduct of its business, those acquired records are treated as having been made by the successor entity such that they constitute business records of the successor entity, and that person can then qualify those as business records through an affiant of their own, not an affiant of the assignor. This case here is the land case, except, as Yaron pointed out, it is a credit card debt case, as opposed to a defaulted note and a mortgage foreclosure case. Otherwise, there's no principal distinction between the two. I know this court is well aware of the procedural history. I wanted to highlight a few points before we get into the discussion of the law. Ms. Call opened up a J.C. Penney branded credit card in 2005 that was issued by Synchrony Bank, defaulted on that with a balance of $6,800. The account was charged off, and in 2014, that account was sold to Calvary. As part of the sale of that account to Calvary, Synchrony also transferred records it has relating to her account. including a cardholder agreement. Calvary then brought a collection action against Ms. Call, which was assigned to the Arbitration Division in St. Clair County. Ms. Call responded to that lawsuit by filing a class action counterclaim alleging violation of the Federal Fair Debt Collection Practices Act, as well as other claims as well, and moved to have the case transferred to the Law Division, which it was. Calvary then timely filed a motion to compel arbitration of the counterclaim supported by an affidavit and accompanying records. After receiving the briefs, the Circuit Court asked for supplemental briefing on precisely this issue that's before it today, the ability of an assignee to incorporate or rely on the records of an assignee. This, Your Honor, is a case about the omission of business records. The Circuit Court ultimately denied the motion to compel arbitration because it determined that, since Calvary's affidavit had never been employed at Synchrony, that's the assigning bank, Synchrony Bank, he had no personal knowledge about Synchrony's record-keeping business practices. And so the records attached to Calvary's affidavit was hearsay and did not fall within the business records exception to the hearsay rule. First of all, let me explain what this case is not about. It's not about whether there was any waiver of the right to arbitrate or whether the arbitration provision is unconscionable as a matter of substance or procedure. The sole issue here is whether Calvary, through its affiant and records custodian, can admit and rely upon those business records. This incorporated business records rule has been adopted widely by the courts in Illinois and across the country. Businesses conduct their business against this backdrop of widely accepted rules and norms, and the Circuit Court's order completely upends that. The Circuit Court's order, again, stated that basically as a matter of law, it's impossible to lay the foundation for the admissibility of Synchrony's records because, quote, Mr. Terry Rivera, who is Calvary's affiant, does not work for Synchrony, and it does not appear from his affidavit that he's ever worked for Synchrony Bank. That is the basis of the order denying the motion to compel arbitration. In fact, in the briefs, Ms. Call goes even further and argues that Mr. Rivera can't even competently swear to what records Calvary received from Synchrony when it transferred its records after purchasing the account. This gets us very far afield from the rules of evidence and the protections they're meant to provide. Tellingly, the court did not cite a single case in support of this incredibly restrictive interpretation of the business records exception to the hearsay rule. Now, we cited in the supplemental brief to the court, as is part of the record, the extensive authority, including from this district and including the land case. And I'll get to that in a moment, but what's telling is that even after asking for supplemental briefing on this issue, the circuit court's order did not even address a single one of the cases we relied on in adopting this rule, including the land case from this district. Instead, it simply adopted the 10-page proposed order proposed by Ms. Call without a single change. Now, in her response to this court, perhaps sensing the extreme position the circuit court has adopted, that an assignee can never authenticate the records of the assignee or Ms. Call appears to acknowledge that they can, and in fact they have in many instances before this court, including in the land case, but that that rule somehow should be restricted to the mortgage arena and not allowed in the context of the assignments of consumer credit card debt. Your Honors, I would submit this is not a principal distinction this court should adopt. In both kinds of cases, we are dealing with debt, debt that is oftentimes assigned between entities and debt that is sought to be collected. It just so happens that in the mortgage space, that debt on a note is secured by a lien and so it results in a foreclosure action, but the foreclosure cases often seek personal deficiency judgments as well. There is not a workable or principal distinction between mortgage debt and consumer credit card debt, at least not so as to justify any distinction in how the records that are passed between assignors and assignees ought to be treated. There's nothing in the records, no authority to support the assertion that credit card records transferred on secondary market are any different or less trustworthy or accurate than the records transferred between mortgage lenders and their assignees and servicers. The Court of Appeals for the First District in a mortgage foreclosure case already dismissed precisely this argument put forward by Call, stating that the defendants in that case made the same argument as they make here, and they, quote, failed to cite a single case indicating that an employee of an assignee cannot rely on and authenticate the records of an assigning entity, and noting that there is actually substantial case law to the contrary. So we have the rule incorporation.  It's been cited widely by courts in Illinois and around the country, and it's rooted in the inherent difficulty of proving a debt that has been assigned, and the crippling impairment of that ability to seek debt that's been assigned if the records that were transferred along with the debt were required to be authenticated by an affluent of the assigned owner. We're talking about the mortgage industry, the credit card industry, the auto finance industry, any aspect of consumer finance where consumer contracts or consumer debt is passed and sold between entities. With that rule in mind, Calories Affidavit in this case exactly meets the parameters for an affidavit under Rule 236. Calories Affidavit says that it received, it purchased Ms. Call's consumer credit card debt from Synchrony. It received records from Synchrony relating to and governing that account. It integrated those records into its own and relied upon those records in the conduct of its business. And then it goes through and recites the magic language that we're all familiar with in 236 related to the creation and maintenance of records in the ordinary course of business. Again, a circuit court order is completely rejected, or we don't even know because it didn't even cite this line of authority of incorporation, which is black letter law. Now, what the circuit court order didn't say, it didn't say that the affidavit hadn't adequately established the assignment or the incorporation or reliance, but that simply Calorie was incapable of ever doing so, which is not the case. I want to go back briefly to the case of Bank of America versus Land. This is a case where Bank of America was not the original mortgagee. It was another entity with a long history of payment records and default. Bank of America purchased that mortgage and sought summary judgment in a foreclosure case using its own employees affidavit that referenced and authenticated and sought to admit the payment records from the prior lender's business. Land, the mortgagor, objected precisely as Ms. Call does here, arguing that because Bank of America is an assignee, it could not possibly authenticate the records it had received from the assigneor before an admissible hearsay. The court completely rejected that argument and stated as follows. Upon incorporating, the records of the original creditor become the records of Bank of America, and Bank of America's explanation in its affidavit regarding the creation and maintenance of the records in the course of Bank of America's business made those records admissible under Supreme Court Rule 236. This was controlling binding authority that the lower court simply ignored, did not even cite to or discuss, after asking for supplemental briefing on precisely this issue. That is one aspect of the circuit court's order. The circuit court also erred in determining that even if the credit card agreement were admissible, it's unclear whether it even controls Ms. Call's account. Because again, Calgary is incapable of testifying that it does because Mr. Rivera does not work for Synchrony or have any personal knowledge that she ever agreed to it. The court seemed to indicate that because the terms and conditions of her credit card account were not signed by her, it's impossible to ever know whether she agreed to those terms and conditions. Now, before we look at the actual evidence that was before the court, in fact, the only evidence, there was no contrary evidence submitted, no counter-affidavit, no statement by Ms. Call that she never used or opened or agreed to the terms and conditions. I want to step back for a second for a dose of common sense. It is indeed the rarest occasion, as we all know, that the physical terms and conditions that accompany a credit card account are actually signed. We get written terms and conditions mailed to us all the time on accounts we have, and this is because of the nature of how credit transactions work. These transactions involve a tripartite relationship. There's an issuer bank who issues the credit card, a consumer who uses the credit card, and a merchant who accepts their credit card. The issuance of the credit card is a standing offer to extend credit. When a cardholder makes a purchase, the bank advances funds to the merchant, and this arrangement constitutes a loan between the issuing bank and the cardholder, and a contract is formed. Acceptance of the terms and conditions is acceptance through performance, through using the credit card. And in fact, the terms and conditions at issue here specifically contain a provision, as do all credit card terms and conditions. If you actually go out and use the card, you are agreeing to every single term in these terms and conditions. Upon use, the cardholder agrees to all the provisions in the cardholder agreement. So there's never been an instance where terms and conditions are actually signed, but that in no way affects whether a binding contract is formed. That's why under Illinois law, suit to collect a credit card debt is not considered suit on a written instrument, but it's actually an oral contract subject to the statute of limitations governing oral contracts. So it's an oral contract, but it's governed by written terms and conditions. Now, let's look at the actual evidence the court had before it here. Calvary's affidavit attested to purchase of the credit card account in connection with that purchase. It was transferred records, including the governing terms and conditions. Call never disputed any of those assertions, never submitted evidence that this was not her account, that she never used the card, or that by using the card she agreed or was somehow bound to the conditions governing the account. Now, the purpose of this proceeding, of the circuit court proceeding, is not to try a question of fact. It's to determine if a question of fact exists. It's a proceeding much like summary judgment. Call never offered any specific reason to doubt the trustworthiness or the reliability of the records other than the fact they were adopted from another business. Under controlling law, an affidavit with facts, including a business record affidavit, must be accepted as true when there's no countervailing affidavit. Ms. Call could have come forward and submitted an affidavit. She could have said, I have two charge cards. I've only ever had two charge cards, a Target card and a Kohl's card. I've never been to JCPenney. I don't have a card. And by the way, here are five witnesses who will say that. In that case, we could have had a mini-trial. There would have been facts on either side. And a trier of fact, the judge could have decided that. There is no evidence on the other side that she didn't incur the debt and that she didn't agree to these terms and conditions. Under controlling authority, then that affidavit and the facts in that affidavit must be accepted as true. Lack of personal knowledge by Calvary in the actual creation of those records, as the Supreme Court Rule 236 says, does not affect the admissibility of the weight. So it could have affected the weight. The fact that Calvary didn't have personal knowledge, it could have affected the weight. She could have come forward with other evidence, and it could have affected the weight. But that was the only evidence submitted. This call relies heavily on the case of asset acceptance versus Tyler, which is an unpublished First District opinion, for the proposition that there was no substantial evidence. Are you trying to talk about a 23? It's an unpublished? This was a case cited in a brief, correct? I'm happy to leave it to the court to ignore that case. It's an unpublished case. It's not admissible. So I would say strike that. Okay, fair enough. And that's the sole case, and I think they actually quote a full page of their brief, comes from that case. It's asset acceptance versus Tyler. Does it have a U by it? Yeah, it's 2012, Dillon-Wayfell first. It's First District, 2012, and it's an unpublished case. It says U. I think that's correct. This was the only opposition to Cavalry's motion to compel in the circuit court. Given that, we believe this court can reverse the order of the circuit court in order that the parties arbitrate the dispute for them and direct the circuit court below to enter that order. I'll leave my time to rebuttal. Thank you, Your Honor. Thank you, Counsel. We'll have an opportunity for rebuttal. Counsel for the appellee. Good morning, Your Honor. Justice Welch, Justice Carver, and Justice Moore. My name is David Cates. This is my associate, Chad Moody. We represent the defendant counter plaintiff appellee, in this case, Julian Call. Counsel. May it please the court. Your Honors, I think I need to start with a little bit of an introduction to this case because what's happening here is fact specific. It's not just legal and law specific. I think that was kind of glossed over by counsel. Although I would be remiss to point out, I have the title of the case here, Justice Welch, and it doesn't say unpublished. What's the number of the case? This one is 966 Northeast 2nd, 1039, or 2012, 11th 1st, 093559. What year is that? 2012. So, as this court is likely aware, this case involves third party debt buyers buying consumer debt and then suing individuals in circuit court. I don't think that there's any dispute amongst the parties that the Calgary never had a contract with my client of any kind. They never had any dealings together whatsoever. But, and this court has recently had an opportunity to consider one of these cases. It's your docket number 51638, Midland Funding v. Hilliker, a similar case related to arbitration. So, I'm not going to get into the extensive history that's revolved around the debt buying industry. When was that case decided? That case was decided approximately a month ago. Is that cited? It's not. These are a little bit different. I'm just talking generally the court's experience with third party debt collections and what those transactions entailed. Typically speaking, and I think it's relevant for the background of what the trial court was considering, you're talking about credit card companies in this case who were selling thousands of accounts at a time and then allegedly transferring documents to people like, or to entities like Calgary. And there's been extensive court criticism of this practice due to inadequate records being transmitted or kept. We cited, it's in the record, a Harvard Journal study called Dirty Debt Done Dirt Cheap that talked about the problems in the industry of lack of documentation, inadequate documentation, and erroneous documentation. So, it's important to consider that the trial court is considering all these things when it's making its determinations below. So, are you suggesting we treat it differently under Supreme Court Rule 236 for credit cards as opposed to mortgages? Absolutely, Your Honor. The appellant's counsel made the argument to this court that there's no difference between a credit card debt and a mortgage. I would point out that mortgages are recorded. There's laws that detail how you have to handle records of mortgages. They're notarized. They're signed by the parties to be bound by them. There's a lien attached to the property to guarantee that debt, which none of which happens with credit card or consumer debt that we're talking about here. So, to argue that a mortgage document is the exact same as a credit card company that's sold is completely erroneous in my opinion, Your Honor. Well, what about the similarities between Rule 236 and Federal Rule 8036? Well, Your Honor, I think that the case law in Illinois is a little different than the case law that's under Federal Rule 8036, and it also ignores the fact that Illinois has its own rule of evidence, 803, in conjunction with Rule 236. So, you have to read those in combination with each other, and it's a little bit different burden under Illinois. And Illinois case law to show how business records can be admitted in this state. So, I would point out there's one erroneous contention made by the appellee, and it's important to this case, Your Honor, and that is the bank who sold this debt to them, to Calgary, is a bank called Synchrony Bank. My client did not open a credit card account with Synchrony Bank. She opened a credit card account with a bank called GE Capital Retail Bank. Okay, and that's important. And that account was opened in March 2005. Pursuant to documents in the record, Synchrony Bank didn't come into existence until June of 2014. And, Your Honor, I have some documents in the record that I'm going to be referring to today to make it easier for the court to see them. Are they in the appendix? They are in the actual record of the court. They're not in the appendix? No, Your Honor. But I have copies to make it easier for the justices to refer along with me to what I'm showing if the court would accept them. So, may I approach and give them to Your Honor? If it's in the record, it's not necessary. Okay, well, I wanted to make it as easy as possible to see what I'm going through, Your Honor, but I'll refer to them so that you can see what I'm talking about. I would say in the future it's good to put things that you want to bring to the court's attention to all the judges in the appendix. I believe most of them are in there, Your Honor. I'm just trying to make sure that when I'm holding up documents that if you wanted to refer to them, you could. And one thing that was not addressed by the appellate that I think bears importance on this court is to understand what happened in the court below. When they filed their complaint, we did file a counterclaim class action for violation of debt collection laws in this state and the Federal Debt Collection Act. They then turned around and filed a motion to file arbitration. Apparently, we don't like the circuit court anymore. We want to go to arbitration because we sued them back. And in response to that, they attached the affidavit that is going to be a focus of this court. And what we did was file a motion to strike that affidavit. Now, the counsel made the argument that because we didn't file a counteraffidavit, therefore, we have to accept their facts as pleasant or as affirmed as true. And there's a controlling case law we cited in our brief. It's a First District case called Evergreen. When we file a motion to strike, we're specifically attacking the sufficiency of their affidavit. So we did not file a counteraffidavit because if we're right, and as the circuit court found in this case, it's unnecessary because their affidavit is inadequate under 191. May I ask you a question about this Pervis case? Sure. That is attached in the appellant's brief. And I want to ask you, is that the identical affidavit that was used in the federal court in Tennessee? In that case, it appears to be the same person who signed the affidavit, Mr. Rivera. It is the same person. I cannot tell you with certainty it's the exact same affidavit. Although I don't think we need to go to Tennessee law because there's ample presidential authority in Illinois. I think they're interpreting the federal rule. And that would be persuasive authority to this court, but obviously not presidential. So I think to start off, it's important that the court understand that we haven't waived any facts at this point. What the circuit court did below was consider our motion to strike. It looked at the Supreme Court Rule 191 and applied it to the affidavit of Mr. Rivera. And it found that it lacked credibility, that Mr. Rivera lacked credibility, that it was not based on personal knowledge. And what the court did was he made an evidentiary rule as to that affidavit and the affirmance that were in that affidavit. And it's clear that evidentiary rulings are to be considered under an abuse of discretion standard, which as this court knows, to reverse you have to find that his credibility determinations were arbitrary, unreasonable. No reasonable person would come to the conclusion that the court did. And I think you're going to see as we go through this argument that it's improbable that anybody would come to a conclusion other than what the court did. So it's important to keep in mind the evidentiary rulings the court made as to whether or not to omit business records or to strike portions of the affidavit which the court did or review them under abuse of discretion standard. And that actually comes from the Bank of America v. Land case. To start with the arguments or to start with what the court did, excuse me, Your Honor, the first things the court did was strike some paragraphs of Mr. Rivera's affidavit. And it struck paragraphs 8 and 9, and you'll see that in the record. At paragraph 8, one of the things that Mr. Rivera is swearing to, note that Mr. Rivera is a paralegal for the servicer of the owner of the debt that was bought by the, that was owned by some other party. At paragraph 8, Mr. Rivera is swearing that on the sale of accounts, Synchrony Bank transferred its records to Cal. What personal knowledge does Mr. Rivera have to make that statement? He has, there's nothing in this affidavit that lays out facts that show that he would know what Synchrony did. The only thing Mr. Rivera can likely attest to is that I'm looking at a computer screen that says Synchrony on it. The only way that anyone would know what Synchrony Bank did was to either be involved in that transfer, which Mr. Rivera doesn't allege he was, or to be told by someone, which is hearsay, not personal knowledge. So the court is making a determination that Mr. Rivera lacks personal knowledge to make that affidavit, which is completely reasonable because there's no affidavit, there's no facts in this affidavit, which support Mr. Rivera having any knowledge of what Synchrony did or did not do. There's actually no facts in this affidavit that show that Mr. Rivera had any knowledge of what Synchrony actually sent. And it's important to note that you'll see in the record there are a number of things attached to that. And I've just got a sample here, and it starts at record page C068. This is an example of what Mr. Rivera said is the records of the bank. And it looks like the lines from his spreadsheet with lots of redactions. But the court can look at this and determine, is this how a bank with a nine-year relationship with a customer keeps its records? There's nothing in here about billing statements. There's nothing in here about payment history. There's nothing in here that would indicate this is how that bank kept records for a credit card. The only thing that we have is the aberrant of a litigation paralegal saying, well, Synchrony sent us this. But how do we know that? How can the court know that that's what happened without any facts from Mr. Rivera to back that up? So when the court makes that judgment, the credibility determination, he's entitled to use the evidence in the record to make that determination. So there's no error in excluding paragraph 8. And paragraph 9 is similar, and this is what the appellate's counsel was arguing, that when Calvary transmitted its business records, they became our business records. Now we get to use them. It's a legal conclusion, Your Honor. How do we know that these are Synchrony's business records? Where is the foundation for these records? There's no evidence in this affidavit other than a conclusion, not a fact, by a litigation paralegal that these are business records. As the court knows, a business record is a legal term in this state. To be a business record and to come into court, you have to lay a foundation for it. And there's no foundation for these documents other than a litigation paralegal saying, well, this is what Synchrony gave to us with no facts to support it. Is there – I mean, can you provide any case law which suggests that a successor or business cannot rely on the records of the company they bought the records from? Your Honor, I don't think – I think that question is a little broad, and I'll tell you why. Because in the cases that are cited by the appellant, there's no case that says incorporated business record doctrine. There's no case that says integrated business record doctrine. In fact, what those cases require – there's only three cases cited by the appellant that are actually admissible. He cited two unpublished opinions, one Northern District case that's persuasive, not precedential, and one case from Kentucky that's persuasive, not precedential. The three Illinois Appellate Court cases that he cited are Bank of America v. Land, Northbrook Bank and Trust, and the Abnix case. And all of those cases come to the same conclusion that the records that were being admitted were the parties in which the client was affirming the existence of those records. Because what they're arguing is that we don't have to lay – we don't have to provide any taxes to how we got these documents. As long as we put them into our computer and say that we rely on them, they come in as business records. Your Honor, that would upend the business records standard in Illinois. I could find documents laying in a trash can, put them in my computer, and say, yep, these are the ones that I'm going to rely on. And there's no requirement that the documents – how they got there, there's no requirement for an indicia of reliability, which is one of the things that we argue in our brief, Your Honor. Michael Graham, on evidence, notes that the business records rule exists because the business records have an indicia of reliability. Otherwise, they're useless for that purpose. However, in this case, with the ample authority that exists out there about the problematic recordkeeping in this industry, these records don't carry that indicia of authority. And further, Your Honor, there's no evidence that this is the way the SYNCHRONY kept its business records. For a business record to apply, it has to be made in the usual course of business. There's no evidence this was. It has to be made at any other time of occurrence. No evidence this was. So what they would like the law to be is we pick up whatever we want from wherever we want, we claim it's our business record, and therefore it comes in. That's not the law we don't believe, Your Honor. With regard to the case Brawner v. Allstate and Dignity Company, wasn't it decided in that case that there wasn't a need to have personal knowledge or to personally participate in the creation of the business record or even to know who actually reported the information? Well, Your Honor, I think that that's a little bit different standard than what we're talking about here. We're not saying that Mr. Rivera had to participate in creating these records, but what we're saying is if this court held in Bank of America v. Lane, if you want to establish a foundation for admitting business records, you have to do it through the testimony of a records custodian or another person familiar with the creation of that record. So there needs to be some fact showing that these records were created at some time relevant to the transaction at issue or even to be called a business record under Illinois law. I guess I've misinterpreted Bank of America. I thought it also held that once the successor holder is incorporated, the records of that prior lender become the records of the successor lender, and thus the client was able to properly lay the foundation because of familiarity with the predecessor's procedures. Well, Your Honor, the case Northbrook Bank and Trust, which cites the Bank of America v. Land, takes a, when it's discussing the Bank of America v. Land case, what it points out, that court, the First District Court, points out that in its opinion, Bank of America v. Land, what it did was allow a bank to make its own, or to admit its own records based on the testimony of a client. And what we have here is, these are not records of capital. These are somebody else's records they're trying to admit by just saying, well, we're going to rely on that. In all of these cases that they cite, the three, these companies had other records, or had their own records that were admitted. And Northbrook Bank and Trust, I think, is a case that lays out in great detail. You had Northbrook Bank and Ravenswood Bank. And Ravenswood Bank was, records were admitted on Northbrook's affiance affidavit. But the court noted it did so because the Northbrook affiance laid out a familiarity with Ravenswood processes as to how they kept and maintained their records. And, Your Honor, I think it wasn't addressed by the appellant. But in conjunction with Justice Moore's comments about the only rules of evidence and the federal rules of evidence, if you look at 803-6, when you're admitting electronic records, which is what the appellant's affiance says these are, you have to submit testimony about the equipment. You have to submit testimony about the reliability of the equipment and that it's standard in the industry. And none of that is in the affidavit, which is also required and not here. So then that's the argument about why the court excluded the credit card agreement because the appellant would find incredible in his testimony, which it would have formed a 236 basis or a 191 basis for admitting the document under Rule 236. But as the appellant noted, the court went farther in its argument, showing that even if it had admitted the arbitration agreement or the credit card agreement, that wouldn't show arbitration here. And I do rely on that set acceptance fee, Tyler, and I think on this point I agree with the appellant. A credit card agreement is no different than any other contract. Are you saying that it is a published opinion? I believe it is, Your Honor. But even were it not, the facts of that case are just black-letter law in Illinois. A credit card agreement is an offer to extend credit to someone. It must be accepted for there to be a binding contract. And as the appellant noted, there's no agreement for a credit card agreement that's signed, certainly not in this case, as the trial court's looking at this agreement. There's nothing on it, and it's in the records, Your Honor, starting at C077. There's nothing on it that has my client's name. There's nothing on it that has her signature. There's no way to know that this agreement applies to my client. And I think you're going to find it doesn't, because if you look at their affidavits, Synchrony Bank didn't come into being until June 2, 2014, according to C066. Or, I'm sorry, C067. That's when GE changed Synchrony. According to C066, Synchrony sold this debt on July 16, 2014. So 44 days after becoming a bank, they sold my client's debt. Now, for the court to believe that this contract applied to my client, because it says Synchrony Bank on it. It doesn't say GE Capital Retail Bank. And this contract couldn't have existed in 2005 when my client opened her account. For the court to believe that this is the contract that applied, the court would have to believe the following things. The Synchrony Bank went through all corporate formalities to change its name. The Synchrony Bank's internal and external legal departments approved this contract. The Synchrony Bank sent this contract out to my client. My client received it. My client read it. My client made a purchase. After making a purchase, my client defaulted. After the default, Synchrony Bank went through all procedures to try and resolve that default. That didn't work. Then Synchrony Bank decided we're going to charge off the debt. Then Synchrony Bank decided we're going to sell it. Then they sold it. Then they agreed to a contract with Calgary. Then the debt was transferred. All of that would have had to happen in 44 days. So the circuit court can certainly look at that to determine that's not the problem. And it's not credible to believe that this contract is not the one that applies. Thank you, Your Honor. Thank you. No problem. Thank you. I'm looking at page II in your brief, and I believe you cite Bank of America v. Beeman. Is that correct? I think that's correct. How could you cite that? Is there any reason? It's a non-published case, isn't it? I don't have it in front of me. If it is unpublished, I apologize for that. So we're going to have to strike everything that's in your brief on that? On Beeman? Yes. Yeah, that may have slipped in in a spring-sided case. Now, do you know why it's not a published case? Can you tell by looking at the number? I can't. I think the number is 2014-11-2nd-140313-U. Now, why is that unpublished? You mean the presence of a U? A U. It's unpublished. So you can't cite any of those cases in the future. Thank you, Your Honor. I apologize if that slipped in there. In rebuttal, I just want to take a few moments. I believe the appellee took the position that in order for this court to affirm the circuit court's order, it must create a distinction in how it applies Rule 236 based on whether we're talking about mortgage debt or credit card debt. That's what they're asking you to do. This may be the first time I've heard a consumer lawyer sing the praises of the mortgage industry. I don't think I need to remind this panel of the mortgage crisis we just went through and the little thing called collateralized debt obligations and the Dodd-Frank Act and the creation of the Consumer Protection Financial Bureau. All of that was done because of a crisis in the documents relating to mortgages and mortgage debts and debts that are transferred between mortgage lenders and their servicers. Now, I appreciate the Harvard Law Review article they cite to. That is not evidence. That is something you could submit to a legislative panel and say, We need to reform this industry. Here's some really good ideas by a very smart person who's willing to do this. That casts perhaps a shadow over the debt collection industry, but it's not evidence in this case. Can I stand up in here and say that in every single case collectors of debt get it absolutely perfect? I can't. But that's why in every single debt collection case, it's subject to contrary evidence on the other side. They could come in and say we got it wrong in this case, and they haven't done so. So Rule 236 applies to mortgage debt the same that it applies to any other debt. The job here for this panel is much easier. In essence, really they're talking about reforming the debt collection industry through a varying interpretation of Rule 236. Again, that's simply the wrong form. If they have a complaint, they can ask for the passage of laws like we've seen passed in the federal arena or certainly lobby the Supreme Court Rules Committee for some sort of carve-out to the application of Rule 236. But in a particular case, when a sworn affidavit posits that this is what occurred, this is what controlled, and there's no contrary evidence, a sort of overall kind of cloud through a Harvard Law Review article is simply insufficient to create a disputed issue of fact in this case. I'll talk briefly about the Tyler case, and I apologize if I got that wrong. It was unpublished, and following up on my apologies here to Justice, the Tyler case was in a completely different procedural posture. It was a… Counsel, if you're citing an unpublished case, I would ask you to refrain from discussing it. Well, this is the case that counsel just represented is in fact published in the Northeast Reporters. This is asset acceptance versus Tyler that the counsel just discussed. That was a close arbitration proceeding to confirm an award. Section 13 of the FAA requires that parties seeking to confirm an award submit the arbitration agreement. The parties seeking to affirm the award failed to do so. They simply did not submit the award in any form, much less attach to an affidavit. They tried to make up for that by attaching it to a motion to dismiss, literally just stapling it to a motion to dismiss and submitting it without a single affidavit. The appellate court was the first district found it insufficient and said that one, not only is the procedure was improper because it wasn't filed with the original complaint to confirm the award, but there was no accompanying affidavit saying this agreement here applies to her account. Obviously, this case is very different. Here we have an affidavit. Thank you, Your Honor. Thank you, counsel. The court will take this matter under advisement and issue a decision in due course.